UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

LEE O'CONNELL,

                            Plaintiff,

              -against-

KILOLO KIJAKAZI,[1]
ACTING COMMISSIONER OF SOCIAL SECURITY,

                           Defendant.

-----------------------------------------------------------------------x

**DECISION AND ORDER**

18-cv-10546 (AEK)

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.[2]**

       Plaintiff Lee O'Connell brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or the "Commissioner"), which denied his application for disability insurance benefits ("DIB") under the Social Security Act (the "Act"). ECF No. 1. Currently pending before the Court are the Commissioner's motion, and the Plaintiff's cross-motion, for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. ECF Nos. 18, 20. For the reasons set forth below, the Commissioner's motion (ECF No. 18) is GRANTED and the Plaintiff's cross-motion (ECF No. 20) is DENIED.

---

      [1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi has been substituted for Nancy A. Berryhill as the Defendant in this action.

      [2] The parties consented to the jurisdiction of Magistrate Judge Lisa Margaret Smith pursuant to 28 U.S.C. § 636(c) on April 15, 2019. ECF No. 13. The case was reassigned to the undersigned on October 15, 2020.

## I.      BACKGROUND

### A.  Procedural History

On July 22, 2015, Plaintiff filed an application for DIB, alleging February 19, 2015 as the

onset date of his disability.  Administrative Record ("AR") 50-57.[3]  Plaintiff claimed he was

disabled due to ankle pain after two prior surgeries; right knee pain after exploratory surgery;

and a torn labrum in his right shoulder.  AR 51.  Following the denial of Plaintiff's claim by the

Social Security Administration (the "SSA" or "Agency") on October 7, 2015, Plaintiff requested

a hearing before an administrative law judge ("ALJ").  AR 64-75, 76-78.  An administrative

hearing was held on August 25, 2017; Plaintiff appeared in person and testified at the hearing,

and vocational expert Esperanza DiStefano testified by telephone.  AR 27-49.

ALJ Katherine Edgell issued a decision on November 8, 2017, finding that Plaintiff was

not disabled within the meaning of the Act from February 19, 2015 through the date of the

decision.  AR 15-22.  On November 20, 2017, Plaintiff filed a request for review of the ALJ's

decision with the SSA's Appeals Council, which was denied on September 24, 2018.  AR 1-6,

165-66.  That made the ALJ's November 8, 2017 decision the final decision of the

Commissioner.  The instant lawsuit, seeking judicial review of the ALJ's decision, was filed on

November 13, 2018.  ECF No. 1.

### B.  The Supreme Court's Decision in *Carr v. Saul* and
###      Plaintiff's Decision to Proceed

On April 22, 2021, the Supreme Court issued a decision in *Carr v. Saul*, 141 S. Ct. 1352

(2021), in which it held that applicants for Social Security disability benefits who had hearings

conducted, and/or decisions issued, by an ALJ whose appointment was not in accordance with

---

[3] Citations to "AR" refer to the certified copy of the administrative record filed by the
Commissioner.  ECF No. 12.

the Appointments Clause of the U.S. Constitution were not required to administratively exhaust their Appointments Clause challenges during proceedings before the Agency before raising such challenges for the first time in federal court.

In light of the *Carr* decision, and to promote efficiency and judicial economy, this Court issued an order on May 10, 2021 directing the parties to meet and confer regarding whether this case should be remanded to the Commissioner for a new hearing before a constitutionally appointed ALJ different from the ALJ who previously heard and adjudicated Plaintiff's claim for benefits.  *See* ECF No. 27.  The May 10, 2021 Order noted that in this case, the hearing before ALJ Edgell was conducted, and ALJ Edgell's decision was issued, before the appointments of any SSA ALJs were ratified by the Acting Commissioner of the Agency in July 2018.  *Id.*; *see* 84 Fed. Reg. 9583 (2019) (Social Security Ruling 19-1p).  Plaintiff was ordered to submit a letter on or before June 1, 2021 setting forth whether or not he believed the case should be remanded, and the Commissioner was authorized to submit a response, if necessary, on or before June 8, 2021. ECF No. 27.  The Order stated that "[s]hould Plaintiff elect not to request a remand on the Appointments Clause issue at this stage, this may constitute a waiver of the Appointments Clause challenge in all further proceedings, including appeals."  *Id.*  The Order also specified that "[a] decision not to request a remand will not prejudice the Plaintiff in any way before this Court, nor will it affect the timing of this Court's decision on the pending motions in this matter should the case remain in federal court."  *Id.*

On May 27, 2021, counsel for Plaintiff submitted a letter in further support of his cross-motion for judgment on the pleadings without discussing the Appointments Clause issue at all. *See* ECF No. 28.  Accordingly, the Court ordered Plaintiff to submit a letter by June 3, 2021 specifically addressing whether Plaintiff sought remand based on the Appointments Clause issue

discussed in *Carr*, and reiterated both the possibility of waiver of any future Appointments Clause challenge and the fact that Plaintiff would not be prejudiced in any way before this Court if he elected to proceed in federal court.  ECF No. 29.  By letter dated June 2, 2021, Plaintiff's counsel informed the Court that "[u]pon conference, we have elected not to request a remand on the issue of the Appointments Clause."  ECF No. 30.[4]

### C. Factual Background

#### 1. Non-Medical History

Plaintiff was born in 1975 and graduated from high school.  AR 32-33.  From 1998 to February 19, 2015, Plaintiff served as a corrections officer in New York City.  AR 45-46, 210, 216-17.  Plaintiff stopped working due to right ankle pain, right knee pain, and right shoulder pain stemming from injuries sustained during several use-of-force incidents, and, as of the date of the administrative hearing, was receiving a disability pension.  AR 33, 208-14.

#### 2. Hearing Testimony

Plaintiff testified at the hearing before the ALJ that since he stopped working in February 2015, the condition that kept him from working has been right ankle pain, AR 33-34; he also reported having "some back issues," AR 40.  According to Plaintiff, his right ankle pain prevented him from being on his feet for a significant period of time.  AR 40-42.  He explained that he felt pain while putting pressure on his foot, that standing up would make the pain go "straight to a high level," and that he also would feel pain while sitting down on "some days."

---

[4] Counsel for the Commissioner mistakenly filed a proposed stipulation and order of remand in this matter on the same day that Plaintiff filed his letter indicating that he was *not* seeking a remand.  *See* ECF No. 31.  This error was brought to the Court's attention by letter dated June 3, 2021, ECF No. 32, and remedied by an order that same day which, among other things, clarified the record and struck the erroneously filed stipulation from the docket, ECF No. 33.

AR 41-42.  That said, Plaintiff also testified that he did not experience any difficulty sitting, and estimated he could carry approximately 30-40 pounds across a room.  AR 40.  He noted that he was "on a couple different medications," but braces and wraps did not work.  AR 34.  In terms of activities of daily living, Plaintiff testified that he did not experience any difficulties with personal care, and was able to assist his children with homework, take the garbage out, and socialize with friends on occasion.  Plaintiff was able to drive despite his ankle injury, including for various errands and driving for 40 minutes to get to the administrative hearing.  *See* AR 32-33, 35-39.

Vocational expert DiStefano testified next.  The ALJ asked Ms. DiStefano to hypothetically consider an individual of Plaintiff's vocational profile who is limited to light work, but who could only stand or walk two of the eight hours per day; climb stairs or squat rarely; occasionally push or pull on his right side; engage in frequent but not continual overhead reach on his right side; and could not work at heights or with unprotected machinery.  AR 47.  Ms. DiStefano opined that such an individual would be able to perform three jobs from the United States Department of Labor's Dictionary of Occupational Titles involving light, unskilled work: (1) parking lot attendant (26,033 positions nationally); (2) marker (304,746 positions nationally); and (3) ticket taker (7,481 positions nationally).  AR 47-48.

### 3.  Medical History

#### i.  Treating Physicians

##### a.  Right Ankle Injuries

Plaintiff first injured his right ankle at work on April 1, 2012, and began seeing Dr. Charles Kaplan of New York Orthopaedic Surgery & Rehabilitation for treatment.  AR 356-58, 362, 364-67, 369-71.  Plaintiff also saw Dr. Gianni Persich, a podiatrist, and underwent right

ankle surgery in November 2012 to repair an osteochondral fracture and remove loose bodies. AR 342-49, 364-67, 369-71.  Plaintiff continued to see Dr. Kaplan after his surgery.  AR 364-67, 369-71.  Over the course of the next year following the surgery, Dr. Kaplan reported mild edema and tenderness on the right ankle, moderate to marked difficulty squatting, and difficulty toe standing.  AR 364-67, 369-71.

Plaintiff sustained another work-related injury to his right ankle, as well as injuries to his left wrist and right knee, during a use-of-force incident on December 16, 2013.  AR 372.  He again saw Dr. Persich after this incident, and Dr. Kaplan observed right ankle derangement during an examination on January 8, 2014.  *Id.*

On February 4, 2014, Plaintiff underwent a second right ankle/foot surgery with Dr. Persich.  AR 383.  After this surgery, Plaintiff continued to see Dr. Kaplan, who reported moderate edema of the ankle, a mildly positive Tinel's sign, and a slight antalgic gait favoring the right leg.  AR 384-94.  Plaintiff could toe stand with slight difficulty and heel stand with difficulty, though that difficulty became milder over the course of 2014.  AR 388-89, 392-94. He could not squat without severe pain at the ankle.  AR 388-94.  By October 2014, Dr. Persich reported that Plaintiff felt intermittent pain in his ankle and swelling exacerbated by standing. AR 344.  Plaintiff was ambulating in a work boot and working on a light duty regimen.  *Id.*

On February 2 and 16, 2015, Dr. Kaplan examined Plaintiff and found that he continued to have moderate edema and a positive Tinel's sign.  AR 406-07.  Plaintiff still felt ankle pain and stiffness, as well as some tingling and numbness on the dorsum and left toe.  *Id.*  He felt more pain when weight bearing, and reported that his ankle frequently gave out or felt unstable. AR 406.  Plaintiff reported that was "feeling a little better with the [physical therapy]," but still felt that "the ankle is a little worse over the last several months," to the point that he was

considering further surgery.  AR 407.  He used compound pain gel and/or Voltaren gel, and also took other prescription pain relievers at times.  *Id.*  During these two visits, Dr. Kaplan evaluated Plaintiff for Workers' Compensation and found that Plaintiff could perform light duty, but had a 50 percent temporary impairment in his ankle.  AR 402-06.

Plaintiff continued to see Dr. Kaplan for treatment of his right ankle after February 19, 2015, the alleged onset date of his disability.  AR 413-14, 419, 422-23, 426.  Dr. Kaplan observed moderate edema of the ankle laterally and medially, and his Tinel's sign was positive to mildly positive.  AR 413-14, 419, 422-23, 426.  Plaintiff exhibited a slight antalgic gait favoring the right leg, and sometimes walked with a slight external rotation to the lower leg.  AR 414, 423, 426.  He could toe stand and heel stand with difficulty to slight difficulty, but he could not squat without severe pain at the ankle.  AR 413-14, 419, 422-23, 426.  Plaintiff also complained of tenderness of the Achilles tendon and posterior ankle pain with plantar flexion.  AR 414, 422-23.  Plaintiff continued to attend physical therapy and was told to wear a neoprene ankle sleeve. AR 413-14, 419, 422-23, 426.  Plaintiff also continued to take various prescription pain relievers. AR 414, 419, 423.  In his Workers' Compensation progress reports from this period, Dr. Kaplan assessed a 50 percent temporary impairment of Plaintiff's right ankle.  AR 415-16, 420-21, 424-25.  Dr. Kaplan also cleared Plaintiff for light duty.  AR 415-16, 424-425.

Plaintiff saw Dr. Persich for a follow up appointment on August 31, 2015.  AR 342-43. He was ambulating in a work boot and reported intermittent pain and swelling exacerbated by standing.  AR 342.  Dr. Persich found that Plaintiff suffered from osteochondritis dissecans, as well as joint derangement of the right ankle.  *Id.*  Dr. Persich concluded that Plaintiff had reached maximum medical improvement for his right ankle, with a 42 percent total scheduled loss of use based on Workers' Compensation guidelines.  AR 342-43.

On May 18, 2017, Plaintiff saw Dr. Liliana Taich at Riverdale Family Practice ("Riverdale"), complaining of right ankle pain.  AR 472.  Dr. Taich found that Plaintiff suffered from acute right ankle pain and referred him for x-rays on his ankle.  AR 473.

A few weeks later, on June 5, 2017, Plaintiff began seeing Dr. Chaiyaporn Kulsakdinun at Montefiore Hospital for his right ankle.  AR 498-501.  Dr. Kulsakdinun observed that Plaintiff ambulated with an antalgic gait and had a limited, painful range of motion in his ankle.  AR 498.  Dr. Kulsakdinun assessed Plaintiff with chronic right ankle pain, and a history of osteochondritis dissecans lesions and multiple arthroscopic procedures.  AR 499.  Dr. Kulsakdinun ordered a magnetic resonance imaging scan ("MRI") of Plaintiff's right ankle.  *Id.*  The MRI showed findings about the ankle joint, including deformities of the medial and lateral malleoli, as well as extensive amorphous serial and possible bone formations.  AR 456.  The MRI also showed an osteochondral lesion of the lateral talar dome.  *Id.*  When Plaintiff returned to Dr. Kulsakdinun on June 30, 2017, the doctor gave Plaintiff an injection in his right ankle joint.  AR 502-03.  Dr. Kulsakdinun assessed Plaintiff with right ankle arthritis.  AR 503.  Dr. Kulsakdinun noted that Plaintiff "want[ed] to continue with conservative treatment of the disorder," including "conservative [prescription medication] despite the pain," and would "continue bracing and home exercise program."  *Id.*

During a subsequent examination on August 11, 2017, Dr. Kulsakdinun observed that the injection helped Plaintiff "temporarily," and that Plaintiff had an antalgic gait but good range of motion.  AR 505-06.  Dr. Kulsakdinun offered ankle fusion as a potential procedure and advised Plaintiff to consider that option.  AR 506.  At the hearing before the ALJ on August 25, 2017, Plaintiff testified that he was "in the process" and "going for the pre-op" for his third ankle surgery.  AR 34.

**b.  Right Knee Injuries**

Plaintiff injured his right knee and right elbow at work on March 20, 2013 while restraining an inmate, and visited Dr. Barry Katzman, an orthopedic surgeon, on July 7, 2013. AR 282-83.  Dr. Katzman noted that Plaintiff continued to have right knee pain, localized to the medial joint line.  AR 282.  Plaintiff had full extension of the right knee to zero degrees (normal extension), and flexion to 110 degrees (normal flexion being 135 degrees).  AR 283.  Dr. Katzman assessed right knee internal derangement and a possible medial meniscus tear, and recommended an MRI of the right knee.  AR 283-84.  The MRI showed ligament strain but no meniscal tears, and Dr. Katzman recommended a diagnostic arthroscopy at a subsequent appointment.  AR 304-05.  Plaintiff ultimately underwent the arthroscopy on December 20, 2013, and Dr. Katzman reported on December 31, 2013 that although Plaintiff's knee had given out once, it "look[ed] good" and had "regained a lot of the motion."  AR 295.

Plaintiff sustained another work-related injury on December 16, 2013, including an abrasion of the right knee, among other injuries.  AR 372.  Dr. Kaplan saw Plaintiff for his right knee injury (in addition to his right ankle and a left wrist injury) on January 8, 2014.  *Id.*  Dr. Kaplan noted that there was an abrasion on Plaintiff's right knee, as well as a surgical scar from his December 2013 arthroscopy, but Plaintiff has full extension of the knee, and flexion was 110 degrees.  *Id.*  Dr. Kaplan also noted full extension of the knee and 110 degree flexion at a subsequent appointment on February 19, 2014.  AR 383.

Plaintiff returned to Dr. Katzman multiple times in 2014.  AR 286-94.  On June 17, 2014, Plaintiff reported that he had been "doing better until last month when he developed some right knee pain."  AR 287.  Dr. Katzman found that there was full extension of the knees to zero

degrees and flexion to 120 degrees, with some tenderness but no instability.  AR 287.  Dr.

Katzman recommended another MRI of the right knee, which Plaintiff declined.  AR 286-87.

On March 3, 2015, Plaintiff returned to Dr. Katzman for a follow-up appointment and

complained that his right knee still gave out on him.  AR 281.  Dr. Katzman assessed that

Plaintiff had reached maximum medical improvement and calculated a 15 percent loss of use

under Workers' Compensation guidelines.  *Id.*

### c.  Right Shoulder Injury

Plaintiff sustained a work-related injury to his right shoulder during a use-of-force

incident on November 29, 2013.  AR 395.  He saw Dr. Kaplan for treatment on April 9, 2014.

*Id.*  Dr. Kaplan observed that there was diffuse tenderness at the right shoulder anteriorly and

laterally, and a mildly positive impingement sign.  *Id.*  Dr. Kaplan identified right shoulder

derangement.[5]  *Id.*  An MRI taken on April 10, 2014 showed, among other things, moderate

diffuse rotator cuff tendinosis and a tear extending from anterior to posterior, but it did not show

a rotator cuff tear.  AR 439.  During a follow-up appointment with Christopher Kyriakides, D.O.,

on June 9, 2014, Plaintiff displayed continued impingement with weakness and a limited internal

rotation of his shoulder.  AR 396.  Dr. Kyriakides noted, however, that Plaintiff "should continue

therapy as he should do well with conservative management."  *Id.*

Plaintiff saw Dr. David Capiola of Orthopaedic Specialists of Greater New York on June

11, 2014.  AR 279.  Dr. Capiola assessed Plaintiff with a significant tear in his right shoulder as

well as joint derangement.  *Id.*  Dr. Capiola recommended right shoulder arthroscopy and

---

[5] Dr. Kaplan also assessed right hand derangement at this appointment stemming from the November 29, 2013 incident.  AR 395.  But Plaintiff's right hand injury is not the subject of his claim for DIB—it was not included in Plaintiff's application for DIB, *see* AR 51, not referenced as a severe impairment in the ALJ's decision, *see* AR 17, and not raised as an issue by Plaintiff's counsel in his memorandum of law in support of his cross-motion, *see* ECF No. 21.

discussed the option of a corticosteroid injection, but Plaintiff chose to proceed with physical therapy at that time.  *Id.*  Two months later, on August 13, 2014, Plaintiff complained of "significant pain" in his right shoulder, and Dr. Capiola administered a corticosteroid injection. AR 280.

Dr. Kaplan also saw Plaintiff for his right shoulder in July, September, October, and December 2014, as well as on January 12, 2015.  AR 397-401.  Plaintiff continued to exhibit tenderness and a limited range of motion in his shoulder and used Voltaren gel.  *Id.*  On March 3 and April 1, 2015, Dr. Kaplan filled out Workers' Compensation reports regarding Plaintiff's right shoulder, in which he indicated that Plaintiff had a 15 percent permanent impairment.  AR 410-11, 427-29.

### d.  Left Wrist Injury

Plaintiff sustained an injury to his left wrist during a use-of-force incident on December 13, 2013.  AR 372.  Dr. Kaplan saw Plaintiff on January 8, 2014 and noted mild tenderness on the dorsum of the left wrist, especially on the radial side, as well as mild tenderness in the anatomic snuff box, the triangular region on the hand between the index finger and thumb.  *Id.* An MRI on May 6, 2014 showed some signal abnormality and irregularity suggesting a tear, and there was some tendinosis within one wrist tendon, but the other wrist tendons appeared to be intact.  AR 373.  Plaintiff continued to see Dr. Kaplan for his left wrist in 2014, with persistent mild tenderness on the dorsum of the left wrist.  AR 383-89.  He attended physical therapy for his wrist, but did not feel the need to undergo surgery.  AR 385-89.

### e.  Sleep Apnea

Plaintiff saw Dr. Ludmila Sedlackova at Riverdale on July 15, 2016 for a "head checkup." AR 478-79.  He complained of a metallic taste in his mouth for over a month, and a loss of smell

for two months (since he experienced a fall in May 2016).  AR 478, 480.  Plaintiff stated that he could not sleep due to sleep apnea, but he did not wear his continuous positive air pressure mask because he found it uncomfortable.  AR 478.  Dr. Sedlackova referred Plaintiff to an otolaryngologist, and to a pulmonologist who could assist Plaintiff in getting fitted for a new mask.  *Id.*  Plaintiff then participated in a sleep study at White Plains Hospital on August 24, 2016 and was diagnosed with severe sleep apnea.  AR 450-54.  ALJ Edgell asked a brief series of questions about Plaintiff's sleep apnea at the administrative hearing; Plaintiff testified about his discomfort with the mask and his inability to fall asleep with it, and confirmed that he does not "fall asleep behind the wheel or anything when [he is] out driving."  AR 44-45.

### ii.   Consultative Examinations

#### a.   Dr. J. Serge Parisien

Plaintiff saw Dr. J. Serge Parisien, an orthopedic surgeon, for a Workers' Compensation independent orthopedic evaluation on June 15, 2015.  AR 307-09.  This examination concerned Plaintiff's March 20, 2013 workplace injuries to his right elbow and knee.  AR 307.  Dr. Parisien reported that Plaintiff's right elbow revealed no obvious deformity, with normal range of motion and no tenderness or instability.  AR 308.  Dr. Parisien's examination of the right knee revealed full extension and flexion to approximately 120 degrees.  *Id.*  He found no tenderness or swelling, and surgical scars were healed.  *Id.*  Dr. Parisien concluded that maximum medical improvement had been achieved, finding no loss of use of the right arm and a 10 percent loss of use of the right leg, in accordance with Workers' Compensation guidelines.  AR 309.

#### b.   Dr. Julia Kaci

Dr. Julia Kaci, a family medicine practitioner, examined Plaintiff on September 25, 2015 at the request of the SSA.  AR 351-55.  Plaintiff's "main complaint" was his right ankle,

although he also reported injuries to his right knee and right shoulder from a work-related incident in 2012.  AR 351.  Plaintiff told Dr. Kaci that his past ankle surgeries "did not help much," that he continued to have constant pain in his right ankle, which would lock and feel stiff and swollen, and that he could not walk more than a block or two because of the pain.  *Id.*  In addition, Plaintiff told Dr. Kaci that his knee pain was intermittent and dull, but was brought on by weightbearing, which would make his knee feel unstable and give out.  *Id.*  Plaintiff reported a history of right shoulder rotator cuff tendinopathy, with intermittent pain brought on by sleeping on that side or raising his shoulder above his head.  *Id.*

Dr. Kaci observed that Plaintiff's gait was slightly antalgic, favoring the right ankle, and that he could not walk on heels and toes.  AR 352.  Plaintiff could only squat a third of the way down due to ankle pain, but also observed that Plaintiff did not need any assistive device, nor did he need help changing or ambulating during the exam.  *Id.*  Dr. Kaci reported that the range of motion of Plaintiff's right shoulder was limited to 30 degrees, but that he had a full range of movement for his elbows, forearms, wrists, and fingers.  *Id.*  Plaintiff's right ankle showed swelling on both sides, but in her examination of Plaintiff's lower extremities Dr. Kaci observed full range of motion in Plaintiff's ankles, full strength in his muscles, no muscle atrophy, no sensory abnormality, no reflex abnormality, and no joint effusion or instability.  AR 353.

Dr. Kaci diagnosed Plaintiff with right ankle pain status post surgeries, intermittent right knee pain, and intermittent right shoulder pain.  *Id.*  Based on the exam, she found that Plaintiff had marked limitations to walking, going up and down stairs, standing, and squatting; moderate limitations to lifting and carrying; moderate limitations to pushing and pulling with the right shoulder; and mild limitations to activities requiring reaching above the head with the right arm. *Id.*

## II.    APPLICABLE LEGAL PRINCIPLES

### A.  Standard of Review

The scope of review in an appeal from a Social Security disability determination involves two levels of inquiry.  First, the court must review the Commissioner's decision to determine whether the Commissioner applied the correct legal standard when determining that the plaintiff was not disabled.  *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir. 1999).  "'Failure to apply the correct legal standards is grounds for reversal.'"  *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir. 1984)).

Second, the court must decide whether the Commissioner's decision was supported by substantial evidence.  *Green-Younger v. Barnhart,* 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* at 106 (quotation marks omitted).  When determining whether substantial evidence supports the Commissioner's decision, it is important that the court "carefully consider[] the whole record, examining evidence from both sides."  *Tejada,* 167 F.3d at 774.  "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled."  *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999).  If the "decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its own] judgment for that of the Commissioner."  *Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir. 2002).

### B.  Determining Disability

The Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than twelve months." 42 U.S.C. § 423(d)(1)(A).  An individual is disabled under the Act if he or she suffers from an impairment which is "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).  "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must follow in determining whether a particular claimant is disabled.  *See* 20 C.F.R. § 404.1520(a)(4).  The Commissioner first considers whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), (b).  If the claimant is engaged in substantial gainful activity, then the Commissioner will find that the claimant is not disabled; if the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to the second step, at which the Commissioner considers the medical severity of the claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  A severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant suffers from any severe impairment, the Commissioner at step three must decide if the impairment meets or equals a listed impairment; listed impairments are presumed severe enough to render an individual disabled, and the criteria for each listing are found in Appendix 1 to Part 404, Subpart P of the Social Security regulations.  20 C.F.R. §§ 404.1520(a)(4)(iii), (d).

If the claimant's impairments do not satisfy the criteria of a listed impairment at step three, the Commissioner must then determine the claimant's residual functional capacity ("RFC").  20 C.F.R. § 404.1520(e).  A claimant's RFC represents "the most [he or she] can still

do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1).  After determining the

claimant's RFC, the Commissioner proceeds to the fourth step to determine whether the claimant

can perform his or her past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), (e)-(f).  If it is found

that the claimant cannot perform his or her past relevant work, the Commissioner proceeds to

step five to consider the claimant's RFC, age, education, and work experience to determine

whether he or she can adjust to other work.  20 C.F.R. §§ 404.1520(a)(4)(v), (g).  To support a

finding that the claimant is disabled, there must be no other work existing in significant numbers

in the national economy that the claimant, in light of his or her RFC and vocational factors, is

capable of performing.  20 C.F.R. § 404.1560(c).

    The claimant bears the burden of proof on the first four steps of this analysis.  *DeChirico*

*v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998).  If the ALJ concludes at an early step of the

analysis that the claimant is not disabled, he or she need not proceed with the remaining steps.

*Williams v. Apfel*, 204 F.3d 48, 49 (2d Cir. 2000).  If the fifth step is necessary, the burden shifts

to the Commissioner to show that the claimant is capable of performing other work.  *DeChirico*,

134 F.3d at 1180.

## III.   DISCUSSION

### A.  The ALJ's Decision

    ALJ Edgell applied the five-step sequential analysis described above and issued a

decision finding that Plaintiff was not disabled from the alleged onset date of February 19, 2015

through the date of the decision, November 14, 2017.  AR 15-22.  First, the ALJ found that

Plaintiff had not engaged in substantial gainful activity since February 19, 2015, the alleged

onset date.  AR 17.  Second, the ALJ determined that Plaintiff suffered from the following severe

impairments: osteoarthritis of the right ankle status post two ankle surgeries; bilateral shoulder

injuries status post rotator cuff surgery; history of derangement of the left wrist and hand; status post right knee arthroscopy; and sleep apnea. *Id.*  Third, the ALJ concluded that none of Plaintiff's impairments or any combination of impairments met or medically equaled the severity of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 18.

According to the ALJ, Plaintiff retained the RFC to perform "light work,"[6] with the exceptions that he can only stand or walk for two hours each eight-hour workday; rarely climb stairs or squat; occasionally push or pull on the right; frequently but not continually reach overhead on the right; and cannot work at heights or unprotected machinery.  *Id.*

The ALJ determined Plaintiff's RFC by applying the two-step framework described in 20 C.F.R. § 404.1529, concluding first that "the claimant's medically determinable impairments could reasonably be expected to have caused [Plaintiff's] symptoms."  AR 19.  The ALJ next determined that "the allegations concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence," and then proceeded to explain her reasoning for that conclusion.  AR 19-20.  The ALJ provided a summary of the evidence in the record, with a focus on key findings regarding Plaintiff's treatment for injuries to his right ankle and right knee.  AR 18-20.[7]  As set forth in the decision, the ALJ acknowledged Plaintiff would not be able to work if all of his testimony and statements

---

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).

[7] With respect to the medical records, the ALJ stated that "[a]s for the opinion specific evidence, the undersigned considered all opinions and gave them appropriate weight," citing to the records from Dr. Parisien (AR Exhibit 3F), Dr. Kyriakides (AR Exhibit 4F), and Dr. Kaplan (AR Exhibit 8F).  AR 20.  The ALJ also specifically discussed the examination and findings of Dr. Kaci, the consultative examiner.  AR 19-20.

in the documentary record were supported by evidence, and found it unnecessary to re-state each and every one of Plaintiff's allegations in the decision.  AR 18-19.  While the ALJ noted various "loss of use findings" in the record for various impairments, she gave those loss of use assessments no weight because "the analysis and conclusions for New York State are different from the SSA analysis."  AR 19.  That said, the ALJ found "the underlying functional evaluation" contained in the records of those regular medical visits to be "of great importance," specifically citing the records from Drs. Kyriakides and Kaplan.  *Id.*  The ALJ ultimately determined that Plaintiff's years of medical records overall reflected "mild to moderate abnormalities," which received "conservative" treatment.  *Id.*

At the fourth step, the ALJ found that Plaintiff was unable to perform his past relevant work as a corrections officer, as the "functional capacity requirements of this occupation both as actually performed and as performed in the national economy exceed [Plaintiff's] current RFC." AR 20.

At the fifth step, the ALJ noted that if Plaintiff had the RFC to perform the full range of light work, then Medical-Vocational Rule 202.21 would require a finding of "not disabled."  AR 21.  But the ALJ concluded that Plaintiff's "ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations."  *Id.*  Thus, "[t]o determine the extent to which these limitations erode the unskilled light occupational base, the [ALJ] asked the vocational expert whether jobs exist in the national economy for an individual with [Plaintiff's] age, education, work experience, and [RFC]."  *Id.*  The vocational expert determined and testified that Plaintiff could perform the light, unskilled jobs of (1) parking lot attendant (26,033 positions nationally); (2) marker (304,746 positions nationally); and (3) ticket taker (7,481 positions nationally).  AR 21.  Based on the vocational expert's testimony, the ALJ

found that "considering Plaintiff's age, education, work experience, and RFC, Plaintiff is capable

of making a successful adjustment to other work that exists in significant numbers in the national

economy," and therefore, she determined that a finding of "not disabled" was appropriate.  AR

22.  The ALJ therefore concluded that Plaintiff was not disabled from the alleged onset date,

February 19, 2015, through the date of the decision, November 14, 2017.  *Id.*

### B.  The ALJ's RFC Determination and Evaluation of Medical Evidence

The Commissioner seeks to have her final decision affirmed; she maintains that the

ALJ's decision is supported by substantial evidence and is based upon the application of correct

legal standards.  ECF No. 19 ("Def.'s Mem.") at 20-22.  Plaintiff seeks to reverse the

Commissioner's decision and have the matter remanded to the Agency for further administrative

proceedings.  He contends that the ALJ (1) failed to properly assess the Plaintiff's RFC because

she did not provide a function-by-function assessment; (2) failed to adequately address the

medical opinions of Dr. Kaplan, a treating physician; and (3) failed to fully develop the record.

*See* ECF No. 21 ("Pl.'s Mem.") at 14-16.

Here, the ALJ's decision is supported by substantial evidence and provides a clear record

for meaningful judicial review; accordingly, it is not necessary to remand this matter because the

ALJ did not expressly conduct a function-by-function assessment that included discussion of

Plaintiff's left wrist impairment.  SSR 96-8p is a Policy Interpretation Ruling by the SSA

regarding the assessment of the RFC in initial claims for disability benefits under Titles II and

XVI of the Act.  SSR 96–8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996); *see* Pl.'s Mem. at 14

(arguing that the ALJ "failed to adhere to SSR 96-8p").  It states that the RFC "must first identify

the individual's functional limitations or restrictions and assess his or her work-related abilities

on a function-by-function basis," and "[o]nly after that may RFC be expressed in terms of the

exertional levels of work." *Id.*  SSR 96–8p warns that "a failure to first make a function-by-function assessment of the individual's limitations or restrictions could result in the adjudicator overlooking some of an individual's limitations or restrictions."  1996 WL 374184, at *4.  But this Circuit has made clear that an ALJ's failure to conduct an explicit function-by-function assessment is not a *per se* error requiring remand.  *Cichocki v. Astrue*, 729 F.3d 172, 176-77 (2d Cir. 2013).  The Court in *Cichocki* emphasized that

> [w]here an ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous, we agree with our sister Circuits that remand is not necessary merely because an explicit function-by-function analysis was not performed.

729 F.3d at 177.

There is substantial evidence to support the ALJ's RFC determination that Plaintiff could perform light work with exceptions.  AR 18-22.  The ALJ properly gave substantial weight to the medical opinion of Dr. Kaci, who found that Plaintiff had marked limitations of walking, standing, squatting, and climbing stairs; moderate limitations of lifting, carrying, and pushing and pulling with his right shoulder; and mild limitations of reaching overhead on the right side. AR 20, 353.  Dr. Kaci's opinions were consistent with her clinical findings—that Plaintiff's physical exam was largely normal, except that he had swelling in his right ankle and walked with an antalgic gait, could not walk on heels and toes, could only squat one-third of the way due to ankle pain, and had a limited internal rotation in his right shoulder.  AR 352-53.  In examining Plaintiff's lower extremities—including the right ankle, which Plaintiff testified was the basis of his inability to work—Dr. Kaci observed full range of motion in Plaintiff's ankles, full strength in his muscles, no muscle atrophy, no sensory abnormality, no reflex abnormality, and no joint effusion or instability.  AR 353.  Dr. Kaci's opinions are consistent with Plaintiff's treatment

record, including in the clinical observations of Dr. Kaplan, Plaintiff's treating physician. Dr. Kaplan observed, similarly to Dr. Kaci, that Plaintiff had moderate edema of the ankle, an antalgic gait favoring the right leg, and an inability to squat without severe pain at the ankle. AR 407, 413-14, 419, 422-23, 426. The ALJ properly included these findings of mild to moderate limitations in the RFC determination, finding that "[t]his medical history reflects limitations to the claimant's exertional capacity, particularly in use of the right ankle." AR 19.

Additionally, the ALJ correctly incorporated findings regarding Plaintiff's right knee and shoulder into the RFC determination. *See* AR 19. The ALJ recognized that the treatment record showed mild limitations in both the right knee and shoulder, ultimately determining that Plaintiff's medical record and past functional evaluations "support limitation to light exertional work, with no more than two hours standing or walking, as well as some reduction to use of the right shoulder and leg." *Id.* This conclusion is supported by the medical record, which shows that Plaintiff's right knee was stable by March 2015, *see* AR 281, and that Plaintiff's right shoulder issues were limited to a discrete period between April 2014 and January 2015, *see* AR 279-80, 395-401.

Finally, the ALJ's RFC determination properly incorporated Plaintiff's own testimony about his pain and limitations. Plaintiff testified that he could not be on his feet, standing or walking, for more than ten minutes before needing to sit, but he did not have difficulty sitting, and could lift up to 40 pounds across a room. AR 40. Plaintiff also stated that he could manage the stairs in his house, and that he was able to take out the trash, go grocery shopping, and drive. AR 37-38, 41. The RFC determination takes account of Plaintiff's subjective symptoms, limiting the time he spends walking, standing, or squatting, while also taking account of his ability to sit and carry without significant issue. AR 18-22.

Moreover, Plaintiff's insistence that the ALJ's decision is flawed because of a purported failure to adequately address his left wrist impairment in the RFC analysis, *see* Pl.'s Mem. at 15, is particularly misplaced based on the record here.  Plaintiff sustained injuries to his left wrist (among other injuries) on December 16, 2013 during a use of force incident.  AR 372.  In his initial evaluation by Dr. Kaplan, the doctor detected mild tenderness on the dorsum of the left wrist, especially on the radial side, and mild tenderness in the anatomical snuff box.  *Id.*  The Finkelstein test was negative.  *Id.*  Sensation was intact in the hand, and Dr. Kaplan described Plaintiff's condition as "left wrist derangement."  *Id.*  In the months following his injury (February to December 2014), Plaintiff continued to feel "mild tenderness" on the dorsum of the left wrist, and in the anatomical snuff box, but sensation remained intact in the hand.  *See* AR 383-89.  He attended physical therapy during this time for his wrist and ankle, first 2-3 times a week, and then once a week by the end of 2014.  *Id.*  A May 2014 MRI revealed some abnormalities, including a tendon tear, but Plaintiff did not feel the need to undergo surgery for the wrist and returned to light duty work.  AR 373, 385-89.  Over the course of several Workers' Compensation examinations in 2015, Plaintiff continued to report mild tenderness on the dorsum of the left wrist and anatomical snuff box.  AR 406, 413, 416, 419, 422.

When Plaintiff filed his claim for DIB on July 22, 2015 and listed the medical conditions that limited his ability to work, he did not reference his left wrist.  AR 51, 209.  In her consultative examination on September 25, 2015, Dr. Kaci found that Plaintiff's hand and finger dexterity were intact, and did not report that Plaintiff was experiencing any wrist or hand pain. AR 352.  In September 2015, Plaintiff stated in an SSA Function Report that his injuries did not affect the use of his hands.  AR 234.  There is no evidence in the administrative record that Plaintiff sought medical attention for his left hand or wrist after 2015.  At his administrative

hearing on August 25, 2017, Plaintiff identified the symptom that kept him from working as pain in his right ankle, stated that he was not getting any other treatment at that time for any conditions, and made no complaint whatsoever about his left wrist.  *See* AR 34-35.

Given that Plaintiff did not identify left wrist and hand pain as a symptom that kept him from working in his claim for DIB and did not testify to any such issue at the hearing, the lack of a function-by-function assessment regarding Plaintiff's left wrist for purposes of classifying Plaintiff's RFC is not an error that requires remand.  There is substantial evidence in the record to conclude that Plaintiff no longer had issues with his left wrist or hand that would interfere with his ability to work.  Indeed, Plaintiff was even able to return to his prior work as a corrections officer while he was managing the wrist pain from his 2013 injury.  *See* AR 373, 385-89.  Accordingly, the fact that the ALJ did not include a specific discussion of Plaintiff's left wrist or hand in assessing his RFC is not an error that requires remand.

For all of these reasons, the ALJ applied the correct legal standards in the decision, the RFC determination is supported by substantial evidence, and remand is neither required nor appropriate.

### C.  Evidence of Dr. Kaplan's Medical Opinion

ALJ Edgell did not fail to consider the medical opinions offered by Dr. Kaplan—a review and assessment of Dr. Kaplan's treatment records was part of the ALJ's decision, and does not provide a basis to remand this matter to the Agency for further proceedings.

As a general matter, an ALJ is directed to consider "every medical opinion" in the record, regardless of its source.  20 C.F.R. § 404.1527(c).  Yet not every medical opinion is assigned the same weight.  Under the Social Security regulations, the opinions of a treating source as to the nature and severity of a claimant's impairments are generally, but not always, entitled to "more

weight" relative to those from other treatment providers.  *See* 20 C.F.R. § 404.1527(c)(2); *Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir. 1995).  Such opinions are given controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(c)(2); *Rugless v. Comm'r of Soc. Sec.*, 548 F. App'x 698, 700 (2d Cir. 2013) (summary order).  Conversely, opinions from treating sources "need not be given controlling weight where they are contradicted by other substantial evidence in the record."  *Veino*, 312 F.3d at 588; *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (a treating source opinion is not afforded controlling weight if it is "not consistent with other substantial evidence in the record, such as the opinions of other medical experts.").

In the event that a treating source's opinion is not given controlling weight, the ALJ must still consider various factors to determine the appropriate amount of deference to assign to that opinion.  These factors include: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship; (iii) the extent to which the medical source provides relevant evidence to support an opinion; (iv) the extent to which the opinion is consistent with the record as a whole; (v) whether the opinion is given by a specialist; and (vi) other factors which may be brought to the attention of the ALJ.  20 C.F.R. §§ 404.1527(c)(2)(i)-(ii),(c)(3)-(c)(6).[8]  The ALJ need not provide a "slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."  *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order); *see also Martinez-Paulino v. Astrue*, No. 11-cv-5485 (RPP), 2012 WL 3564140, at *16 (S.D.N.Y. Aug. 20, 2012) ("It is not

---

[8] This citation is to the version of the treating source rule applicable to DIB claims filed before March 27, 2017.  Plaintiff filed for DIB on July 22, 2015; accordingly, this version of the treating source rule is the applicable standard for this matter.

necessary that the ALJ recite each factor explicitly, only that the decision reflects application of the substance of the rule.") (citing *Halloran*, 362 F.3d at 32).   Nonetheless, the Commissioner must "always give good reasons in [his or her] notice of determination or decision for the weight [he or she] give[s] [a claimant]'s treating source's opinion."  20 C.F.R. § 404.1527(c)(2). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand."  *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).   Certain findings, however, such as whether a claimant is disabled and cannot work, are reserved to the Commissioner.  20 C.F.R. § 404.1527(d)(1).

Here, it is simply not correct that the ALJ did not address Dr. Kaplan's findings—the decision references Dr. Kaplan's notes and observations multiple times as part of the determination that Plaintiff had the RFC to perform limited light work.  AR 19-20.  For example, the ALJ cites a February 2015 physical examination performed by Dr. Kaplan, in which he noted "some worsening of the ankle, with moderate edema, mild Tinel's sign, and a slight antalgic gait."  AR 19.  She also notes that in 2015, "the physical examinations of the ankle and knee continued to reflect mild to moderate abnormalities, with generally no more than a mildly antalgic gait," citing physical examinations performed by Dr. Kaplan during that year, among others.  *Id.* (citing Exhibit 8F of the AR, which consists of all of Dr. Kaplan's treatment records and notes).  This includes medical insight gleaned from Dr. Kaplan's Workers' Compensation evaluations.  AR 408-12, 415-18, 420-21, 424-25, 427-29.  The ALJ correctly notes that the standards for assessing disability in the context of Workers Compensation are different than the standards used by the SSA, *see* AR 19, most importantly because for Workers' Compensation

25

purposes, "disability is defined as the inability to return to past relevant work."[9]  *DiPalma v. Colvin*, 951 F. Supp. 2d 555, 574 (S.D.N.Y. 2013) (collecting cases); *see also Brodie v. Comm'r of Soc. Sec.*, No. 19-cv-6968 (PAE) (RWL), 2020 WL 5754607, at *7 (S.D.N.Y. Aug. 25, 2020) ("workers' compensation and social security disability benefits are governed by different standards, and the opinion provided in a workers' compensation claim is not controlling with respect to a claim of disability claim under the Act") (quotation marks and alteration omitted), *adopted sub nom. Brodie v. Saul*, 2020 WL 5775234 (S.D.N.Y. Sept. 28, 2020).  In any event, the ALJ still made significant use of the medical evaluations conducted by Dr. Kaplan and others in connection with Plaintiff's Workers' Compensation proceedings—as specified in the decision, the "underlying functional evaluation[s]" in these medical records were "of great importance" in the ALJ's evaluation.  AR 19.  There is no merit to the assertion that the ALJ did not discuss or reference Dr. Kaplan's medical findings.

Plaintiff also objects to the substantive weight afforded to the opinion of a consultative examiner, Dr. Kaci.  While the Second Circuit has noted that "the opinions of consulting physicians . . . generally have less value than the opinions of treating physicians," *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order), "the opinions of consulting sources may constitute substantial evidence if they are consistent with the record as a whole," *Smith v. Colvin*, 17 F. Supp. 3d 260, 268 (W.D.N.Y. 2014) (quotation marks omitted), and can even "override treating physicians where the non-treating source's opinion is supported by evidence in the record,"  *Williams v. Colvin*, No. 15-cv-6719 (KMK) (PED), 2016 WL 11270671, at *11 (S.D.N.Y. Dec. 14, 2016) (citing *Schisler v. Sullivan*, 3 F.3d 563, 566-68 (2d

---

[9] Indeed, the ALJ *agreed* that Plaintiff is unable to perform his past relevant work as a corrections officer, AR 20, but this is not the end of the inquiry for purposes of an SSA disability determination.

Cir. 1993), *adopted sub nom. Williams v. Comm'r of Soc. Sec.*, 2017 WL 4326119 (S.D.N.Y.

Sept. 28, 2017).  In addition, when considering the weight to give a medical opinion, ALJs may

consider "the amount of understanding of our disability programs and their evidentiary

requirements that a medical source has, regardless of the source of that understanding."  20

C.F.R. §§ 404.1527(c)(6), 416.927(c)(6).

In her decision, the ALJ emphasizes that she "considered all opinions and gave them

appropriate weight," though she gave the medical opinion of Dr. Kaci the most weight because

Dr. Kaci's findings were "consistent with the record of generally conservative care, and [were]

supported by the claimant's self-reporting of activity levels."  *Id.*  The ALJ added that

"[consultative examiners] are highly qualified medically acceptable sources who are

knowledgeable in Social Security disability evaluation."  *Id.*  The "substantive weight" given to

the findings of Dr. Kaci is appropriate because those findings were consistent with the findings

of Plaintiff's treating physicians.  After her examination on September 25, 2015, Dr. Kaci

diagnosed Plaintiff with right ankle pain status post surgeries, right knee intermittent pain, and

right shoulder intermittent pain.  AR 353.  She noted that Plaintiff's gait was slightly antalgic,

that he was unable to walk on heels and toes due to ankle pain, and that he had "marked

limitations to walking, going up and down the stairs, standing and squatting."  *Id.*  At the same

time, she observed that Plaintiff needed no assistive device, rose from his chair without

difficulty, and did not need help changing or getting on or off the table during the exam, AR 352,

and concluded that he had only moderate limitations to lifting and carrying, moderate limitations

to pushing and pulling with the right shoulder, and mild limitations to activities requiring

reaching above the head with the right arm.  *Id.*  The ALJ incorporated these observations into

her finding that Plaintiff was limited to light work, with substantive reduction to use of the right ankle, and additional postural and manipulative limitations.  AR 20.

Dr. Kaci's conclusions after the consultative examination were similar to the findings made by Dr. Kaplan during the course of his treatment of Plaintiff.  In his reports regarding Plaintiff's functional limitations, Dr. Kaplan found that Plaintiff had a slight antalgic gait favoring the right leg, could toe stand with "slight difficulty," and could heel stand with difficulty.  AR 406.  Plaintiff could not squat without severe ankle pain.  AR 407.  Dr. Kaplan noted that Plaintiff could not run, stairs hurt, and his walking was still limited to a few blocks. *Id.* at 407, 414, 423, 426.  But in many of the impressions recorded by Dr. Kaplan over his course of treatment of Plaintiff, Dr. Kaplan did not find Plaintiff's right ankle injury to be totally disabling, even for Workers' Compensation purposes.  AR 356-60, 362-63, 369-70, 386-89, 391-94.  At bottom, this is not a case where the weight the ALJ afforded to the opinion of the consultative examiner represented a departure from the findings of Plaintiff's treating providers, and therefore cannot be framed as the ALJ disregarding the findings of the treating sources. Rather, the medical evidence from both the treating sources and the consultative examiner provided substantial evidence to support the ALJ's evaluation and the denial of Plaintiff's claim. *Cardoza v. Comm'r of Soc. Sec.*, 353 F. Supp. 3d 267, 283 (S.D.N.Y. 2019) ("When weighing the opinion of a non-treating source, the ALJ must consider how closely the opinion aligns with the objective medical record evidence, which is similar to its evaluation of a treating source."); *Hill Ogletree v. Saul*, No. 19-cv-7208 (JCM), 2020 WL 3171354, at *12 (S.D.N.Y. June 15, 2020) (finding that the ALJ appropriately assessed the consistency of the consultative source's opinion with the objective evidence in arriving at the RFC).

For all of these reasons, the ALJ appropriately considered medical evidence from Plaintiff's treating sources, and followed the correct legal standards by affording appropriate weight to the findings of the different physicians who evaluated Plaintiff.  Specifically, the ALJ's decision sufficiently addressed and relied on the records from Dr. Kaplan, and the findings of Dr. Kaci, which were given substantive weight, were supported by evidence in the record, including the findings from Dr. Kaplan's long course of treatment.  The manner in which the ALJ's considered this evidence does not provide any basis for remand to the Agency.

### D.  The ALJ's Development of the Record

Plaintiff also contends that remand is warranted because the ALJ did not fully develop the record with respect to Dr. Kaplan's medical findings.  Pl.'s Mem. at 16.  As discussed above, Dr. Kaplan's records are featured at various points in the ALJ's decision and were accorded appropriate weight.  To the extent Plaintiff is suggesting that the ALJ should have sought a specific medical opinion from Dr. Kaplan regarding Plaintiff's RFC, the Court disagrees.  The ALJ satisfied her duty to develop the record, and Plaintiff's argument to the contrary is without merit.

An ALJ has an "affirmative obligation to develop the administrative record," because hearings on disability benefits are essentially non-adversarial proceedings.  *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  The ALJ must obtain records regarding the claimant's complete medical history for at least the 12 months preceding the month in which the claimant files an application.  20 C.F.R. § 404.1512(b)(1).  ALJs must make "every reasonable effort" to assist the claimant in obtaining evidence from medical sources and the entities that maintain the claimant's medical evidence.  *Id.*  But where there are no obvious gaps in the administrative record and the ALJ possesses a complete medical history, the ALJ is under no obligation to seek additional

information in advance of rejecting a social security disability benefits claim.  *See Rosa v. Callahan*, 168 F.3d 72, 79-80 (2d Cir. 1999).  Remand is not required when an ALJ fails to request opinions, particularly when the record contains sufficient evidence from which an ALJ can assess the claimant's RFC.  *See Tankisi*, 521 F. App'x. at 33-34 (citing 20 C.F.R. § 404.1513(b)(6)) (it would be "inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity")).

There are no obvious gaps in the administrative record here, and the ALJ already had a complete medical history that was sufficient to enable her to assess Plaintiff's RFC.  *See Williams*, 2016 WL 1127061, at *11.  The record in this case thoroughly covers the 12-month period prior to the date Plaintiff filed his claim, and also includes records of treatment he received before and after that period.  *See* AR 278-454.  The ALJ obtained records from office visits with Dr. Katzman, Plaintiff's orthopedic surgeon, spanning July 2, 2013 to March 3, 2015, AR 281-306; Workers' Compensation progress notes, dated March 3, 2015 to August 18, 2015, from Dr. Kyriakides, AR 310-41; progress notes from Dr. Persich, Plaintiff's podiatrist, AR 310-349; radiology reports from Montefiore Imaging, AR 455-68; treatment records from Riverdale Family Practice, dated March 9, 2015 to July 14, 2017, AR 469-96; and progress notes from 2017 visits with Plaintiff's orthopedic surgeon, Dr. Kulsakdinun, AR 455-507.  And as previously discussed, the ALJ obtained over 100 pages of medical records from Dr. Kaplan, which covered orthopedic care Plaintiff received from April 1, 2012 to November 16, 2015.  AR 356-448.  Many of Dr. Kaplan's records in particular include opinion evidence which provide support for the ALJ's disability determination.  AR 356-60, 362-63, 369-70, 386-89, 391-94.

Given that the ALJ received and considered an extensive set of medical records, including records from Dr. Kaplan that contained some opinion evidence, records from various

other treating sources, and records from a consultative examiner, the overall administration

record contained sufficient evidence from which the ALJ could assess Plaintiff's RFC.  *See*

*Tankisi*, 521 F. App'x at 33-34.  Accordingly, the ALJ was not required to seek additional

information before rejecting Plaintiff's disability claim, and remand is not warranted on this

basis.

### E.  Step Five Determination

Although Plaintiff does not specifically challenge the ALJ's determination at the fifth

step of the analysis that there is other work that Plaintiff can perform in view of his RFC, age,

education, and work experience, the Commissioner argues in her motion papers that this

determination was correct.  *See* Def.'s Mem. at 23.  The Court agrees.

The ALJ concluded that Plaintiff retained the RFC to perform light work with the

exceptions that he can only stand or walk for two hours each eight-hour workday; rarely climb

stairs or squat; occasionally push or pull on the right; frequently but not continually reach

overhead on the right; and cannot work at heights or unprotected machinery.  AR 18.  Thus, as

noted by the ALJ, Plaintiff's "ability to perform all or substantially all of the requirements of this

level of work has been impeded by additional limitations."  AR 21.  For the reasons stated in

Section III.B, *supra*, the ALJ's RFC determination was proper and supported by substantial

evidence.  Consequently, the ALJ's decision to use the Medical-Vocational guidelines as a

framework for decision-making and consult a vocational expert was proper as well.  Substantial

evidence supported the hypothetical work profile presented by the ALJ to the vocational expert

to elicit her testimony, and the ALJ properly relied upon that testimony in determining that there

were a significant number of jobs in the national economy to which Plaintiff could adjust,

specifically the light, unskilled positions of parking lot attendant, marker, and ticket taker.  AR

21-22.  The ALJ's determination, in reliance on the vocational expert's testimony, that Plaintiff could adjust to other work that existed in significant numbers in the national economy was therefore both proper and supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (ECF No. 18) is GRANTED and the Plaintiff's cross-motion for judgment on the pleadings (ECF No. 20) is DENIED.  The Clerk of the Court is respectfully directed to enter judgment in favor of the Commissioner.

Dated: September 30, 2021
          White Plains, New York

**SO ORDERED.**

_____
ANDREW E. KRAUSE
United States Magistrate Judge